UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI
CASE NO. 08-20746-CR-MORENO

UNITED STATES OF AMERICA

v.

LAZARO ALVAREZ
_____/

**MR. ALVAREZ'S MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE OR, ALTERNATIVELY, MODIFICATION OF SUPERVISED RELEASE TO REMOVE COMPUTER & INTERNET RESTRICTION**

The defendant Mr. Alvarez, through counsel, respectfully files his motion for early termination of his federal supervised release, leaving intact his lifetime reporting requirement to the Sherriff's Office. Alternatively, he seeks modification of his supervised release to remove the restriction on computer and internet use, again, leaving intact his lifetime reporting requirement to the Sherriff's Office. Mr. Alvarez's demonstrated rehabilitation and extraordinary successes in his personal and professional lives support this motion. As illustrated by the attached letters, which are brimming with tremendous community support from employers, friends, and family—all of whom are aware of Mr. Alvarez's underlying offense—this is an extremely unique case, worthy of the requested relief.

I. RELEVANT FACTS

    A. **Arrest, Sentencing, Work History, Initial Supervision, and Modifications**

In June of 2006, law enforcement contacted Mr. Alvarez about downloading and viewing images of child pornography. PSI ¶¶ 8-11. He immediately confessed,

voluntarily reported on two separate dates to the FBI, continued his confession, and submitted to a polygraph, which he passed. *Id.* at ¶¶ 12-17.

On August 22, 2008, Mr. Alvarez was arrested for distribution and possession of child pornography. *Id.* at p. 2. Shortly thereafter, on September 24, 2008, he pled guilty pursuant to a written plea agreement and waived his right to appeal. *Id.* at ¶¶ 1, 5. In his acceptance of responsibility statement, he said he was "grateful" that he was caught and begged for help. *Id.* at ¶ 21.

On November 20, 2008, he was sentenced by the Court to 108 months, as opposed to the 78 months jointly recommended by the Parties. *Compare* DE 15 *with* 19. As part of the sentence, the Court imposed supervised release for life. DE 19:3. One condition of supervision was a lifetime ban on computer use. DE 19:4. At sentencing, the Court said, "No computers, period. That's how I'll say it. No computer. End of story. You can't use computers to look at, travel, to look at while you're in jail or outside. That's how I'm going to do it." DE 23 (Sent'g Tr. at 24).

Mr. Alvarez did not file an appeal or any post-conviction challenge. He served his entire sentence at FDC Miami, and while incarcerated, he accomplished the following. From February 2009 through May 2011, he was assigned to work in the kitchen and was quickly promoted to the first position on the cold line, which meant he was trusted to ensure no contraband was placed on any carts. He did this for three hours per day.

From May 2011 through March 2013, FDC recommended he move from the kitchen to commissary, where he worked full-time and was quickly promoted to the

first position. While there, he helped rework the layout of the commissary to make it easier to fill orders for inmates. From March 2013 until his release, he returned to the kitchen as the Clerk, which is the lead kitchen position, responsible for training the other inmates working in the kitchen. During that period, he was also the recreation orderly for two hours a day, maintaining equipment, running all the contests and games. In 2014, he enrolled in and completed his Janitorial Floor Care Certificate.

In addition to his kitchen and recreation responsibilities, from June 2013 through May 2016 (which was about a month before his release), FDC also entrusted him to work as a Suicide Watch Companion for four hours per day. He was responsible for observing and reporting on an inmate's behavior, but to also engage them in conversation, all with the goal of ensuring that the inmate did not harm himself.

Mr. Alvarez was released directly to his home in mid-2016 from FDC. Shortly thereafter, his supervision was modified with his consent to include the sex offender treatment program. DE 20. On July 19, 2018, his supervision was modified a second time to give Mr. Alvarez permission to use a computer at his employment site for employment purposes only. DE 22. At the hearing, the Court indicated it had reservations, but granted the request—which was unopposed by the government and probation—stating, "nothing would delight me more—well, almost nothing—would delight me more than you proving to me that there is hope." DE 24 (Trans. Status Conf., 7/19/18).

3

### B. Mr. Alvarez's Continued Extraordinary Employment Success

Upon his release, he took the first available job washing cars, has been employed steadily ever since, and has achieved extraordinary employment successes. He is currently working at NeoBroadband, where he started in the warehouse and eventually was promoted. According to a company executive, "we gave [Mr. Alvarez] a chance five years ago and until this day he is giving his best every day." Ex. 1 (Chief Operating Officer Edmerson Vasquez, 2/21/21).

However, it is the attached letter of support from the Operations Manager at NeoBroadband that is nothing less than exceptional in detailing Mr. Alvarez's incremental, diligent, and hard-earned accomplishments. *See* Ex. 2 (Alyn Alonzo, 3/10/21). He details Mr. Alvarez's rise in the company, starting with how in 2017, Mr. Alvarez figured out a way to classify a 53' trailer more quickly, thereby saving the company $28,000 a year. *Id.* at 2. Mr. Alvarez was ultimately promoted and, when the company hired a temporary assistant to handle the computer work, Mr. Alvarez "diligently worked to establish new contacts and customers" and established a business relationship with one supplier that, one year later, became a top-5 supplier for the company. *Id.* at 3. Within another year, Mr. Alvarez secured another business relationship that became yet another top-5 supplier for the company. *Id.* at 4.

In 2018, the company initiated the process to request permission from this Court to use a computer for work because it saw his work ethic, attitude, and progress. *Id.* And because this Court granted that request, Mr. Alvarez was promoted to a position with a salary and a commission and was entrusted with a company car,

keys, and alarm code to the facility. *Id.* In 2018, Mr. Alvarez was also tapped by the company to work on its charity programs. *Id.* at 6.

In 2019, he was entrusted to coordinate the company's response to a warehouse fire with the company's insurance lawyers. *Id.* In 2019, Mr. Alvarez also successfully developed another business relationship that became critical to the company surviving the challenges of 2020. *Id.* at 7. In 2019, Mr. Alvarez was also put in charge of applying for company awards, and he secured a number of awards for the company, including U.S. Small Business Administration SBA: Exporter of the Year for the State of Florida, and South Florida Business Journal's Top 25 Fastest Growing Companies to Watch in South Florida. *Id.* at 6-7.

During the pandemic, because Mr. Alvarez continued to work in person, he volunteered to search and stock cleaning supplies for the office, as well as to lead a team applying for local and federal aid. *Id.* at 8.

### C. Remaining Computer and Internet Restrictions Preclude Professional and Personal Growth

According to his employer, Mr. Alvarez's current computer and internet restrictions preclude him from being considered for a promotion, where he could earn between $55,000 and $65,000 per year. *Id.* at 9. To be promoted at NeoBroadband to a position such as Sales Director, Mr. Alvarez would need to be able to communicate with customers and the team in a variety of means and be available at all hours. *Id.* Mr. Alvarez would also need to be able to travel at a moment's notice. *Id.* The company has customers all across the country and Sales Directors often need to travel for business deals and to explore opportunities. *Id.* He would need to be able to manage

and communicate with locations around the world in different time zones, and generally be available to work and communicate on multiple platforms after normal business hours. *Id.*

The restrictions also preclude and inhibit Mr. Alvarez's employment opportunities outside NeoBroadband. In 2020, for example, Mr. Alvarez was unable to keep his second job with McDonald's—which he picked up to help with his brother's mounting medical bills—after Probation asked the business to sign a permission form to allow him to remain employed. He currently has the opportunity to join part time the startup auto dealership of his friends, Jessica Cuevas and Emilio Garcia. Ex. 3 (letter, 3/20/21). They have been friends for about twenty years, and this opportunity would allow Mr. Alvarez to keep his job at NeoBroadband, while also working additional hours. This part-time job would not only utilize the skills he has developed at NeoBroadband, but it would also give him the opportunity to grow professionally by giving him more leadership and corporate responsibility. They wish to bring him on as a part owner without requiring any financial investment by Mr. Alvarez because they recognize, need, and value his skill set with purchasing, finance, and sales. This would be a tremendous opportunity for professional growth that is not possible with his current restrictions.

The restrictions also inhibit Mr. Alvarez's employment mobility. If NeoBroadband were to downsize, the flexibility and wonderful opportunities afforded to Mr. Alvarez would not be easy to find again with his current restrictions. Mr. Alvarez

cannot apply for jobs online and is ineligible for management positions with salaries similar to his current position because of his restrictions.

The restrictions also affect his educational opportunities. Mr. Alvarez would like to finish his Associates' degree at Miami-Dade Community College; however, he cannot because, in order to balance work and school, he would need to attend online.

In his personal life, Mr. Alvarez has worked hard to create positive, healthy, and supportive relationships with people. He is fortunate to have been found in prison by a cousin, who helped him re-establish his relationship with his family. His younger cousin says that "[i]f it weren't for Lazaro, I would still be a high school dropout." Ex. 4 (Josue Vilarchao, 2/19/21 (detailing Mr. Alvarez supporting and tutoring him 2-3 hours per day, 4-5 days per week, for 14 months)). Another friend, who knew Mr. Alvarez before his federal case, describes how Mr. Alvarez emerged from prison "wiser and more dedicated than ever to make the most of his life." Ex. 5 (Claudia Castro, 2/17/21). And despite their shared childhood traumas, when Mr. Alvarez was released from prison, he reconnected with his brother, who had suffered a terrible accident and had become an amputee. Ex. 6 (Gilberto Alvarez, 3/15/21). His brother says that Mr. Alvarez calls him every day on his lunch break to check on him and make sure he is okay, mentally and physically, in addition to helping with groceries, appointments, and spending time with him watching old movies.

Even his landlord, who knows of his legal situation, wanted to write this Court and advise that she has known Mr. Alvarez for five years as a tenant and friend and finds him to be of "good character, organized, and responsible." Ex. 7 (Diana Medina,

7

1/26/21). Yet, in terms of forming relationships, after Mr. Alvarez meets people in person, he cannot connect with them through social media or text. In America at this time, his restrictions make it difficult to establish, maintain, and grow healthy relationships.

### D. Mr. Alvarez's Compliance with Mandatory State Law and Federal Supervised Release

Pursuant to Florida law, Mr. Alvarez is subject to mandatory reporting to the State of Florida every six months, and he complies with that requirement. This is a mandatory state requirement that is in place regardless of his federal supervision. *See* https://offender.fdle.state.fl.us/offender/sops/faq.jsf (Florida Department of Law Enforcement's non-exhaustive list of sex offender requirements and corresponding citations to Florida statutes). During those meetings, he must answer law enforcement's questions about any number of things, including: his employment; address; home and cell phone numbers; "all electronic mail addresses, Internet identifiers, and each Internet identifier's corresponding website homepage or application software name." *Id.*

Mr. Alvarez has complied fully with the terms of his federal supervision. He has paid his special assessment in full, reported when directed, and maintained employment. He also completes polygraphs and has had no infractions. He commenced Probation's outside sex offender therapy program with Anaga Psychotherapy in 2016 and was successfully released from the program in 2020. Ex. 8 (Anaga Report,

5/2/20).[1] Anaga advised that he "accepted his sexual offense and took full responsibility for his actions since he started the program." He "accepted the therapeutic interventions without being defensive offering insightful statements regarding himself." He also completed a "victim impact letter" and "wrote a solid and well thought out relapse prevention plan that he shared with his group" that was characterized as "honest and insightful." He credits his Catholic faith and hope "for assisting him in his personal rehabilitation" and was deemed by Anaga to have a good prognosis. *Id.*

In addition to his compliance and excellent work record, Mr. Alvarez meets the nine criteria for early termination outlined in the Memo from the Committee on Criminal Law of the Judicial Conference of the United States regarding in part early termination of supervision. *See* Ex. 9 (*Cost-Containment Strategies Related to Probation and Pretrial Services Offices*, Memo from Committee on Criminal Law of the Judicial Conference, p. 2 (Feb. 16, 2012)). Finally, Mr. Alvarez's own words detailing his path to rehabilitation and redemption are attached for the Court. Ex. 10 (Alvarez, 3/29/21). His respect for the Court is evident, and his understanding that it is his responsibility to use every day to earn the respect of others is clear.

II. ARGUMENT

    A. **Early termination of supervised release is appropriate in this unique case based on Mr. Alvarez's extraordinary rehabilitation and compliance, as well as the fact that he will continue to be subject to state statutorily-mandated lifetime sex offender reporting every six months.**

---

[1] The Anaga Termination Report is filed after Mr. Alvarez consulted with Probation, and the redacted information is available in ¶ 58 of Mr. Alvarez's PSI.

9

As demonstrated by the last five years, which are characterized by total compliance with supervision, exemplary behavior, acts of service, dedication to his church and others, and huge strides in his personal and professional life, Mr. Alvarez takes his continued rehabilitation seriously and is an ideal candidate for termination of supervised release. The standard for making a determination for early termination of supervised release is whether, in a felony case after the expiration of one year of supervision, the Court is satisfied that early termination is warranted by the conduct of an offender and is in the interest of justice. *See* 18 U.S.C. § 3583(e)(1). As demonstrated by his actions, Mr. Alvarez has not just complied with the letter and spirit of supervision—he has embodied the best of what supervision can be. Termination is in the interest of justice, both under the statute and under the Committee's criteria.

As an initial matter, Mr. Alvarez has been on federal supervision for five years. He set goals in his personal and professional life that were incremental, realistic, and reasonable, to ensure he had truly acquired the skills he needed to continue his rehabilitative and constructive path towards reentering society. He has worked with Probation and, as demonstrated by his employer's glowing support, Mr. Alvarez has not squandered the opportunity given to him by this Court. He has filed this motion only after establishing a track record that shows what he has become.

Mr. Alvarez meets the nine articulated factors for consideration for termination because he has: maintained stability in his community, home, and employment; complied with the terms and conditions of supervision; no aggravating role in the offense of conviction; no history of violence; no recent arrests and no pending charges;

no recent evidence of alcohol or drug abuse; no recent psychiatric episodes; no identifiable risk to the safety of any identifiable victim; and no identifiable risk to public safety based on the results of any risk assessment. *See* Ex. 9 at 9.

Importantly, Mr. Alvarez is required by Florida statute to register and report *for life* as a sex offender, which means he reports every six (6) months to law enforcement. *See* https://offender.fdle.state.fl.us/offender/sops/faq.jsf (Florida Department of Law Enforcement's non-exhaustive list of sex offender requirements and corresponding citations to Florida statutes). During those meetings, he must answer law enforcement's questions about any number of things, including his employment; address; home and cell phone numbers; "all electronic mail addresses, Internet identifiers, and each Internet identifier's corresponding website homepage or application software name." Thus, even if Mr. Alvarez is removed from federal supervision, he will be under the supervision of the Sherriff's Office for the rest of his life. For all these reasons, early termination of Mr. Alvarez's supervised release is appropriate in this rare and unique case.

### B. Alternatively, Mr. Alvarez's supervised release should be modified to allow him to use a computer and smartphone with internet for work and his personal life.

Alternatively, a motion to modify a term of supervised release to remove the computer restriction would satisfy the factors set forth in 18 U.S.C. § 3553(a). *See also United States v. Tome,* 611 F.3d 1371, 1376 (11th Cir. 2010) ("It is not necessary for a special condition to be supported by each § 3553(a) factor; rather, each factor is

an independent consideration to be weighed."). Here, Mr. Alvarez has made remarkable strides professionally despite his restrictions. After successfully seeking a modification from this Court, he has "proved the Court wrong" through his continued success. As set forth in his employer's letter, there are many more opportunities—professionally and salary-wise—that could be available to Mr. Alvarez if the computer restriction were lifted, such that he could carry a smartphone and access the internet outside of his physical office. Ex. 2 at 9.

Concerning his personal life, courts have struggled with computer restrictions in this rapidly evolving world. The Eleventh Circuit has upheld computer and internet bans, but they have usually been of limited duration. *See Tome,* 611 F.3d at 1371 (one year); *United States v. Moran,* 573 F.3d 1132 (11th Cir. 2009) (three years); *United States v. Taylor,* 338 F.3d 1280 (11th Cir. 2003) (three years); *United States v. Zinn,* 321 F.3d 1084 (11th Cir. 2003) (three years). The absolute ban on the use of a personal computer for life is no longer reasonable or feasible. *See United States v. Ramos,* 763 F.3d 45, 60 (1st Cir. 2014) ("There is ample reason to believe that it will be harder and harder in the future for an offender to rebuild his life when disconnected from the computer at home").

The Supreme Court recently deemed unconstitutional a lifetime ban on the use of a computer or cell phone with internet access for personal purposes. *Packingham v. North Carolina,* 582 U.S. \_\_\_, 137 S. Ct. 1730, 1734 (2017) (striking down state law that made it a felony for any registered sex offender "to access a commercial social networking Web site" because it violated the First Amendment). The Court held that

12

"[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak, and listen once more." *Id* at 1735. That place, the Court recognized, is "cyberspace – the 'vast democratic forums of the Internet,'" where "seven in ten Americans use at least one Internet social networking service." *Id*. Finding that "[t]his case is one of the first this Court has taken to address the relationship between the First Amendment and the modern Internet," the Court held that:

> By prohibiting sex offenders from using those websites, North Carolina with one broad stroke bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge. These websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. They allow a person with an Internet connection to "become a town crier with a voice that resonates farther than it could from any soapbox."

*Id.* at 1736-37.

While *Packingham* did not involve a defendant on supervised release, it is helpful in considering Mr. Alvarez's motion to remove the computer and internet restriction in his personal life. The Third Circuit has considered *Packingham* in the context of a supervised release restriction and concluded:

> The court may not prevent [defendant] from doing everyday tasks that have migrated to the internet, like shopping, or searching for jobs or housing. The same is true for his use of websites conveying essential information like news, maps, traffic, or weather.

*United States v. Holena,* 906 F.3d 288, 293-94 (3d Cir. 2018). Post-*Packingham,* it appears that the Eleventh Circuit has addressed only a plain error challenge on direct appeal to the constitutionality of lifetime supervised release computer restriction,

13

where the defendant was still incarcerated and had not yet begun supervised release. *United States v. Bobal,* 981 F.3d 971 (11th Cir. 2020). Thus, while the *Bobal* court determined that *Holena* read *Packingham* too broadly, given the specific factual and procedural history in *Bobal,* it is of limited value in assessing Mr. Alvarez's situation. Another case*, United States v. Eaglin,* 913 F.3d 88, 95, 101 n.7 (2d Cir. 2019), applied "a more searching review" of an internet ban that required court approval for any internet access because such condition of supervised release implicated a First Amendment right.

Here, Mr. Alvarez's supervised release can and should be modified to remove the computer and internet restriction. The restriction in his personal life is a "greater deprivation of liberty than is reasonably necessary for the purposes set forth" in § 3553(a). *See Tome,* 611 F.3d at 1376 (considering length of restriction). For the last five years, Mr. Alvarez has demonstrated respect for the law, abiding by every restriction imposed on him. In light of his demonstrated ability to follow the law, his documented and obvious rehabilitation, and his mandatory state reporting for life, it is appropriate to allow him to use the internet, computer, and smartphone in his professional and personal life, in this unique case.

AUSA Jonathan Bailyn was given a copy of this motion and supporting exhibits before its filing, and he advised he will file the government's position in a written response. USPO Maria Villaces advised that Probation cannot agree to termination or modification, but it can provide any information the Court may require regarding

14

Mr. Alvarez's compliance. This motion is filed in good faith, and a proposed order is attached.

III. CONCLUSION

As the Supreme Court recognized in *Packingham*, the importance of the internet to individuals attempting to reintegrate into society cannot be overstated. "Even convicted criminals—and in some instances especially convicted criminals—might receive legitimate benefits from these means for access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives." *Packingham*, 137 S. Ct. at 1737. Mr. Alvarez's demonstrated commitment to rehabilitation and reform, which began the moment law enforcement contacted him in 2006 and continue today as evidenced by his personal and professional successes, mark him as one of those individuals contemplated in *Packingham*.

WHEREFORE, Mr. Alvarez respectfully requests this Court GRANT his motion for early termination of supervised release or, alternatively, MODIFY his supervised release to remove the ban on computer and internet use. A hearing is requested.

    Respectfully Submitted,

    MICHAEL CARUSO
    FEDERAL PUBLIC DEFENDER

By:    */s/ Sowmya Bharathi*
       Supervisory Assistant Federal Public Defender
       Florida Bar # 81676
       150 W. Flagler St., Ste. 1700
       Miami, FL 33130
       Tel: 305-530-7000
       Sowmya_Bharathi@fd.org
       https://fpdsouthflorida.org/

## **CERTIFICATE OF SERVICE**

I HEREBY certify that on April 14, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Sowmya Bharathi*